UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

DAVD JOSE PEREZ YEPEZ,        )
         )
     Petitioner,        )
         )
    v.        )    1:26-cv-00113-JAW
         )
DERRICK STAMPER, *in his*        )
*official capacity as Chief Patrol*        )
*Agent of Houlton Sector, U.S. Border*   )
*Patrol*, et al.,        )
         )
     Respondents.        )

**ORDER ON PETITION FOR WRIT OF HABEAS CORPUS**

Finding the government's detention of a noncitizen without a hearing violates due process, the court grants the noncitizen's petition for writ of habeas corpus and orders the government to provide the noncitizen a bond hearing before an Immigration Judge within fourteen days of this order.

## I.    BACKGROUND[1]

David Jose Perez Yepez, a resident of Skowhegan, Maine, is a Venezuelan citizen who fled to the United States in June 2024 after experiencing violence and political persecution in his home country. *Verified Pet. for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241* ¶¶ 1, 14-15, 23, 26 (*Pet.*) (ECF No. 11).  On June 10, 2024, Mr. Yepez attended a U.S. Customs and Border Protection (CBP) One appointment and stated his intention to seek asylum, upon which CBP granted him

---

[1]    For the purposes of Mr. Yepez's petition and consistent with the parties' stipulation, the Court reviews the relevant facts as pleaded in Mr. Yepez's March 6, 2026 verified petition and accompanying attachments.  *Min. Entry* (ECF No. 10).

parole pursuant to 8 U.S.C. § 1182(d)(5)(A). *Id.* ¶¶ 16-18, 21; Attach. 1, *Appl. For Asylum and for Withholding of Removal* (*Asylum Appl.*). That same day, CBP initiated removal proceedings against Mr. Yepez and issued him a notice to appear, instructing him to appear before an Immigration Judge on October 14, 2025 in Orlando, Florida. *Id.* ¶ 19-20. Mr. Yepez's October 14, 2025 hearing in Orlando, Florida was postponed, and he is currently scheduled for a hearing on June 1, 2027. *Id.* ¶ 25-26. Mr. Yepez maintains his parole set no conditions requiring assurances he would appear at his hearings. *Id.* ¶ 22. Upon entry into the United States, Mr. Yepez moved to Tampa, Florida before later relocating to Skowhegan, Maine where his brother-in-law lives. *Id.* ¶ 23. On February 10, 2025, Mr. Yepez filed an application for asylum due to his fear of kidnapping and violence from the Venezuelan government. *Id.* ¶ 24; *Asylum Appl.* On February 25, 2026, CBP agents arrested Mr. Yepez on his way to work. *Id.* ¶ 29. He remains detained in CBP custody at Fort Fairfield Station in Fort Fairfield, Maine. *Id.* ¶ 34; *Min. Entry* (ECF No. 10).

On March 4, 2026, Mr. Yepez filed an unverified petition for writ of habeas corpus and an emergency motion seeking a temporary restraining order (TRO) against his removal from the District of Maine and to ensure his access to counsel pending his habeas proceedings. *Unverified Pet. for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241* (ECF No. 1); *Emer. Mot. for TRO to Stop Transfer Without Prior Consent* (ECF No. 3) (*Mot. for TRO*). That same day, the Court issued a seventy-two-hour emergency order, enjoining Respondents from transferring Mr. Yepez outside

2

the District of Maine.  *Emer. Order Concerning Stay or Transfer of Removal* (ECF No. 4) (*Emer. Order*).

At the teleconference of counsel on March 6, 2026, Respondents confirmed Mr. Yepez was in their custody in Fort Fairfield, Maine when Mr. Yepez filed his petition, clarifying there were no issues of personal jurisdiction or venue for the Court to consider.  *Min. Entry*.  The parties also agreed that, for the purposes of this order, there are no factual disputes for the Court to resolve in this matter and stipulated to the facts in Mr. Yepez's petition and its accompanying attachments, provided Mr. Yepez refiled a verified version of his petition.  The parties also agreed to forgo an evidentiary hearing and oral argument, allowing the Court to resolve this matter on the parties' briefing only.  Immediately after the teleconference, Mr. Yepez filed a verified version of his petition for writ of habeas corpus.  *See Pet.*

That same day, the Court ordered Respondents to show cause why Mr. Yepez's petition should not be granted, *O.S.C.* (ECF No. 12), and issued a TRO enjoining Respondents from removing Mr. Yepez from the District of Maine until the Court issues its ruling on the pending order to show cause and further ordering Respondents to provide Mr. Yepez reasonable access to counsel during his period of detention.  *Order on Mot. for TRO* (ECF No. 13) (*TRO*).

On March 9, 2026, Respondents filed their response to the order to show cause, opposing Mr. Yepez's petition.  *Return and Resp. to O.S.C. in Opp'n to Pet. for Writ of Habeas Corpus* (ECF No. 15) (*Resp'ts' Opp'n*).  On March 11, 2026, Mr. Yepez filed his reply.  *Reply to Gov't's Return and Resp. to O.S.C.* (ECF No. 16) (*Pet'r's Reply*).

## II.     THE PARTIES' POSITIONS

Mr. Yepez alleges his detention violates the Immigration Nationality Act (INA) and his due process rights under the Fifth Amendment of the United States Constitution. *Id.* ¶¶ 39-77. Mr. Yepez maintains he is illegally categorized as a mandatory detainee pursuant to 8 U.S.C. § 1225(b), rather than a discretionary detainee under § 1226(a) who is entitled to a bond hearing before an Immigration Judge. *Id.* ¶¶ 39-51. He argues Respondents' failure to conduct an initial custody determination and issue a warrant within forty-eight hours of his detention violates the INA and associated regulations, *id.* ¶¶ 39-42, and that his denial of a bond hearing violates his Fifth Amendment due process rights. *Id.* ¶¶ 52-77. He seeks, among other remedies, a writ of habeas corpus ordering his immediate release, or in the alternative, an order requiring an Immigration Judge to provide him a bond hearing as soon as possible. *Id.* 15-16.

In their opposition, Respondents maintain Mr. Yepez is properly categorized as a mandatory detainee under § 1225(b)(2), as dictated by controlling agency precedent. *Resp'ts' Opp'n* at 1-2. However, Respondents acknowledge that "the caselaw from this Court [has] uniformly sustain[ed] challenges to DHS's interpretation of § 1225" and they concede Mr. Yepez's petition is not substantially distinguishable from that line of caselaw. *Id.*

In his reply, Mr. Yepez argues that Respondents have failed to show cause why his petition should not be granted. *Pet'r's Reply.* Consistent with the body of caselaw within this District, combined with Respondents' concession that Mr. Yepez's petition

is not substantially distinguishable from that line of cases and their failure to produce the warrant authorizing his arrest, Mr. Yepez urges the Court to order him released. *Id.* at 3-13. Should the Court not order his immediate release, he maintains, in the alternative, he is still entitled to a bond hearing before an Immigration Judge. *Id.* at 13-14.

### III.    DISCUSSION

#### A.    Jurisdiction

As an initial matter, the Court concludes that it retains jurisdiction over Mr. Yepez's habeas petition. "District courts are limited to granting habeas relief 'within their respective jurisdictions,'" *Rumsfeld v. Padilla*, 542 U.S. 426, 442 (2004) (quoting 28 U.S.C. § 2241(a)), and "with respect to habeas petitions 'designed to relieve an individual from oppressive confinement,' the traditional rule has always been that the Great Writ is 'issuable only in the district of confinement.'" *Id.* (quoting *Carbo v. United States*, 364 U.S. 611, 618 (1961)). Furthermore, under habeas law, jurisdiction in a particular district is established when a petitioner is physically present in the district at the same moment a petition is filed there on his behalf. *Rumsfeld*, 542 U.S. at 435 (2004); *United States v. Hayman*, 342 U.S. 205, 213 (1952); *Ahrens v. Clark*, 335 U.S. 188, 190 (1948). Here, the Court retains jurisdiction over this matter, because Mr. Yepez filed his habeas petition when he was in custody in the District of Maine.

#### B.    The Merits

Consistent with the mass of recent caselaw addressing this question on similar facts, the Court concludes that § 1225(b)(2) is inapplicable to Mr. Yepez, and he is therefore subject to discretionary detention under § 1226(a) and entitled to an initial custody determination and, if denied release, a bond hearing before an Immigration Judge to review that initial custody determination.

     1.    **Statutory Framework**

     a.    **Mandatory Detention under Section 1225(b)(2)**

Section 1225 applies to "applicants for admission," defined as a noncitizen "present in the United States who has not been admitted" or "who arrives in the United States." 8 U.S.C. § 1225(a)(1). Applicants for admission "fall into one of two categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2)." *Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018) (plurality opinion). Relevant here is § 1225(b)(2).[2] Under § 1225(b)(2) "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that [the] alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained" for the duration of removal proceedings. 8 U.S.C. § 1225(b)(2)(A). Thus, § 1225(b)(2) creates a mandatory detention scheme. *See Jennings*, 583 U.S. at 297 (2018) ("[N]either § 1225(b)(1) nor § 1225(b)(2) says anything whatsoever about bond

---

[2] Section 1225(b)(1) subjects arriving noncitizens and "certain other" noncitizens "initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation" to expediated removal proceedings. *Jennings*, 583 U.S. at 287; 8 U.S.C. § 1225(b)(1)(A)(i), (iii). Noncitizens subject to expedited removal can avoid removal with successful asylum claims. However, if a noncitizen detained under § 1225 does not indicate an intent to apply for asylum, express a fear of persecution, or is "found not to have such a fear," he is detained until removed. *Id.* §§ 1225(b)(1)(A)(i), (B)(iii)(IV). Mr. Yepez is an asylum applicant, and Respondents assert only that Mr. Yepez is subject to mandatory detention under § 1225(b)(2), not § 1225(b)(1).

hearings").  As other courts have recognized, this language requires that "several conditions must be met" to impose mandatory detention under § 1225(b)(2).  *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 487 (S.D.N.Y. 2025).  Specifically, the noncitizen must be: "(1) an applicant for admission; (2) seeking admission; and (3) not clearly and beyond a doubt entitled to be admitted." *Id.*; *Martinez v. Hyde*, 792 F. Supp. 3d 211, 214 (D. Mass. 2025).

### b.      Discretionary Detention under Section 1226(a)

By contrast, § 1226 governs the "usual removal process" with an evidentiary hearing before an immigration judge.  *Dept. of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 108 (2020).  Section 1226(a) gives immigration authorities power to issue an administrative warrant and either continue detention for removal proceedings or release the noncitizen on "bond . . . or conditional parole."  8 U.S.C. § 1226(a)(1)-(2).  Section 1226(a) thus "establishes a discretionary detention framework for noncitizens."  *Gomes v. Hyde*, 804 F. Supp. 3d 265, 268 (D. Mass. 2025).  However, § 1226's discretionary detention regime has one exception: immigration authorities "shall take into custody" any noncitizen involved in certain enumerated criminal activities.  8 U.S.C. § 1226(c)(1).  None of those criminal activities is at issue here.

Once arrested under § 1226(a), immigration authorities make an individualized initial custody determination after which they have discretion to release a noncitizen if the noncitizen can "demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding."  8 C.F.R. § 236.1(c)(8) (2025).  If the

7

immigration officer opts for continued detention, the noncitizen may seek review of that decision at a bond hearing before an immigration judge.  8 C.F.R. § 236.1(d)(1) (2025).  At a bond hearing, the government bears the burden of proving "by clear and convincing evidence that [the noncitizen] poses a danger to the community" or "by preponderance of the evidence that [the noncitizen] poses a flight risk."  *Hernandez-Lara v. Lyons*, 10 F.4th 19, 41 (1st Cir. 2021).  An immigration judge's decision to continue detaining a noncitizen may be appealed to the BIA.  8 C.F.R. § 236.1(d)(3).

In *Jennings*, the Supreme Court provided guidance on the difference between the statutes, explaining that § 1225(b)(2) "authorizes the Government to detain certain aliens *seeking admission* into the country under," while § 1226(a) "authorizes the Government to detain certain aliens *already in the country* pending the outcome of removal proceedings."  *Jennings*, 583 U.S. at 289 (emphasis supplied); *see also id.* at 288 (explaining that, "once inside the United States" a noncitizen "*present in the country* may still be removed" under "Section 1226") (emphasis supplied)).

### c.   Parole Pursuant to Section 1182(d)(5)(A)

"Parole pursuant to Section 1182(d)(5)(A) serves a unique function."  *Rodriguez-Acurio v. Almodovar*, No. 2:25-cv-6065 (NJC), 2025 U.S. Dist. LEXIS 233224, at *34 (E.D.N.Y. Nov. 28, 2025).  Although § 1182(d)(5)(A) does not grant admission to the United States, it allows the Secretary of Homeland Security to permit certain noncitizens "on a case-by-case basis" to enter or remain in this country only for "urgent humanitarian reasons or significant public benefit."  8 U.S.C. § 1182(d)(5)(A); *Jennings*, 583 U.S. at 288.   For example, § 1182(d)(5)(A) is

simultaneously the only method of parole for those subject to mandatory detention under § 1225(b), but it also covers asylum applicants who obtain advance parole to travel into and out of the United States. *Caiza v. Scott*, No. 1:25-cv-00500-JAW, 2025 U.S. Dist. LEXIS 211907, at *16 (D. Me. Oct. 28, 2025) (citing 8 C.F.R. § 212.5(f)).

However, parole is "not [to] be regarded as an admission of the alien[,] and when the purposes of such parole . . . have been served," § 1182(d)(5)(A) mandates that "the alien shall forthwith return or be returned to the custody from which he was paroled." *Id.* Thereafter the parolee's case "shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Id.* In other words, parole under § 1182(d)(5)(A) "employs a legal fiction whereby non-citizens are physically permitted to enter the country but are nonetheless 'treated,' for legal purposes, 'as if stopped at the border.'" *Martinez*, 792 F. Supp. 3d at 216 (quoting *Thuraissigiam*, 591 U.S. at 139).

### 2.    Applicable Statutory Basis for Detention

The parties agree Mr. Yepez was paroled into the United States pursuant to § 1182(d)(5)(A), and neither party disputes that Mr. Yepez is "an applicant for admission" or that he is "not clearly and beyond a doubt entitled to be admitted." Instead, the question here, as with so many immigration habeas cases to reach the district courts in recent months, is whether Mr. Yepez is "seeking admission" such that he is subject to mandatory detention under Section 1225(b)(2)(A).

As Respondents concede, recent decisions from district courts within the First Circuit and elsewhere have consistently rejected Respondents' interpretation of

§ 1225(b)(2)'s mandatory detention scheme under similar factual circumstances. *See Mercado v. Francis*, No.25-cv-6582 (LAK), 2025 U.S. Dist. LEXIS 232876, at *9-10, n.22 (S.D.N.Y. Nov. 26, 2025) (explaining that similarly situated petitioners "have prevailed, either on a preliminary or final basis, in 350 [out of 362] cases decided by over 160 different judges sitting in about fifty different courts spread across the United States") (collecting cases); *Lopez v. Trump*, No. 2:25-cv-863, 2025 U.S. Dist. LEXIS 233128, at *6 (D. Vt. Nov. 17, 2025) (rejecting DHS's application of § 1225(b) mandatory detention to re-detain noncitizen originally released under § 1226(a)); *Caiza*, 2025 U.S. Dist. LEXIS 195270, at *7-8 (collecting cases).[3]

The phrase "'seeking admission' is undefined in the statute but necessarily implies some sort of present-tense action." *Martinez*, 792 F. Supp. 3d at 218. As other courts to reach this issue have explained, 'seeking admission' "contemplates that those arriving, i.e. those who appear at the border or a port of entry, [who] must be inspected." *Qasemi v. Francis*, No. 25-cv-10029 (LJL), 2025 U.S. Dist. LEXIS 261199, at *18 (S.D.N.Y. Dec. 17, 2025); *see also Wazilada v. Trump*, No. 2:25-cv-00768, 2025 2025 U.S. Dist. LEXIS 256630, at *11 (D. Vt. Dec. 11, 2025) (same); *Rodriguez-Acurio*,

---

[3]     Most often, though not applicable here, this Court and other district courts have held that a noncitizen continuously residing in the United States for more than two years cannot be considered actively seeking admission and are therefore not subject to mandatory detention under § 1225(b)(2) *See, e.g.*, *Chogllo Chafla v. Scott*, 804 F. Supp. 3d 247 (D. Me. 2025). Rather, a noncitizen "already in the country pending the outcome of removal proceedings" is subject to discretionary detention under § 1226(a), *Jennings*, 583 U.S. at 289, and is therefore entitled to a bond hearing before an Immigration Judge. *See Hernandez-Lara*, 10 F.4th at 41. This limitation comes from language in 8 U.S.C. § 1225(b)(1), which courts across the country have consistently read to extend to § 1225(b)(2), too. *See Moraes v. Joyce*, No. 2:25-cv-00583-JAW, U.S. Dist. LEXIS 234386, at *9-10 (D. Me. Dec. 2, 2025). Mr. Yepez entered the United States in June 2024 on parole, he therefore has not resided continuously inside the country for more than two years.

2025 U.S. Dist. LEXIS 233224, at *64-71 (same); *Coalition for Humane Immigrant Rts. v. Noem*, 805 F. Supp. 3d 48, 81-94 (D.D.C. 2025) (same).

In the context of § 1182 parole, the D.C. District Court has explained that when the statute is "[r]ead according to its plain meaning, a noncitizen 'arriving' in the United States would be one who is in the process of reaching his or her destination (the United States) and making an appearance here," but "[i]t would not naturally be read to refer to someone who previously reached the United States via a port of entry, underwent inspection at that port of entry, and then was paroled into the United States." *Coalition for Humane Immigrant Rts.*, 805 F. Supp. 3d at 90-91; *see also* 8 U.S.C. § 1225(b)(2) (providing for "*inspection* of other aliens") (emphasis supplied).

Although the expiration of § 1182 parole returns the parolee "to the custody from which he was paroled," 8 U.S.C. § 1182(d)(5)(A), district courts across the country have consistently held that the expiration of § 1182 parole does not require treating the noncitizen as if they had never been paroled in the first place. *See Montiel v. Raycraft*, No. 1:25-cv-1610, 2026 U.S. Dist. LEXIS 1726, at *8-9 (W.D. Mich. Jan. 6, 2026); *see also Qasemi*, 2025 U.S. Dist. LEXIS 261199, at *30-35 (rejecting the argument that § 1182(d)(5)(A)'s prescription that a noncitizen be returned to the "custody" from which they were paroled requires a return to the detention authority to which they would have been subject prior to any grant of parole); *Rodriguez v. Rokosky*, No. 25-17419 (CPO), 2025 U.S. Dist. LEXIS 250239, at *4-6 (D.N.J. Dec. 3, 2025) (same); *see also Walizada v. Trump*, No. 2:25-cv-00768, 2025 U.S. Dist. LEXIS 256630, at *38-39 (D. Vt. Dec. 11, 2025) (calling absurd the

11

idea that the expiry of petitioner's parole now placed him in the "perpetual status" of an "arriving alien"); *Caiza*, 2025 U.S. Dist. LEXIS 211907, at *16 ("However, it does not necessarily follow that all those paroled under § 1182(d)(5)(A) were detained under § 1225 in the first instance"); *Aviles-Mena v. Kaiser*, No. 25-cv-06783-RFL, 2025 U.S. Dist. LEXIS 173976, at *10 (N.D. Cal. Sep. 5, 2025) ("termination of parole does not generally require treating noncitizens as if they had never been paroled in the first place").

Instead, "[s]ection 1182(d)(5)(a) suggests that rather than reverting to any prior status, a noncitizen whose parole has expired is treated like the vast majority of undocumented immigrants currently living in this country who are not subjected to expedited removal" and mandatory detention under § 1225(b). *Qasemi*, 2025 U.S. Dist. LEXIS 261199, at *34 (internal quotations and citations omitted); *see also Rodriguez-Acurio*, 2025 U.S. Dist. LEXIS 233224, at *52-58 (same); *Vasquez-Rosario v. Noem*, No. 25-cv-7427, 2026 U.S. Dist. LEXIS 13849, at *20-21 (E.D. Pa. Jan. 26, 2026) (same); *Salgado Bustos v. Raycraft*, No. 25-13202, 2025 U.S. Dist. LEXIS 213487, at *14-19 (E.D. Mich. Oct. 29, 2025) (same); *Coalition for Humane Immigrant Rts*, 805 F.Supp.3d at 81-94 (same); *Harmanpreet Singh v. Albarran*, No. 1:25-cv-01821, 2025 U.S. Dist. LEXIS 260000, at *4-7 (E.D. Cal. Dec. 16, 2025) (same); *Walizada*, 2025 U.S. Dist. LEXIS 256630, at *38-39 (same); *Rokosky*, 2025 U.S. Dist. LEXIS 250239, at *4-6 (same); *E.V. v. Raycraft*, No. 4:25-cv-2069, 2025 U.S. Dist. LEXIS 204373, at *20-21 (N.D. Ohio Oct. 16, 2025) (same); *Aviles-Mena*, 2025 U.S. Dist. LEXIS 173976, at *10 (same).

This logic applies neatly to the facts in Mr. Yepez's case, who, having previously been paroled by CBP, is already present in the United States with a pending asylum application. *Pet.* ¶¶ 1, 18, 24-26; *Pet'r's Reply* at 3. The expiration of his parole does not renew the requirement to return to a port of entry and undergo a new inspection or screening. *See Walizada*, 2025 U.S. Dist. LEXIS 256630, at *26-28; *Qasemi*, 2025 U.S. Dist. LEXIS 261199, at *18-19, 30-35 (same). Neither do Respondents argue that Mr. Yepez is required to undergo a new "credible fear" interview upon the termination of his parole. *Qasemi*, 2025 U.S. Dist. LEXIS 261199, at *18-19; *see also Caiza*, 2025 U.S. Dist. LEXIS 211907, at *14-19 (looking to the circumstances of the initial grant of parole to determine whether § 1226(a) and 1225(b) applied to an expired § 1182 parolee).

Furthermore, Mr. Yepez pursued a lawful pathway to asylum. He applied for and attended his CBP One application appointment before entering the United States, upon which CBP granted him parole. *Pet.* ¶¶ 18, 24-26; *Asylum Appl.* He lodged his asylum application before his parole expired. *Pet.* ¶ 24; *Asylum Appl.* He also maintains that his parole set no conditions requiring assurances he would appear at hearings and Respondents do not dispute or argue any violations of his parole conditions, and, although his parole has expired, Mr. Yepez continues to pursue his asylum application. *Pet.* ¶¶ 18-28. Furthermore, the facts of Mr. Yepez's case are readily distinguishable from *Caiza*, in which this Court held that the "circumstances of [an expired § 1182 parolee's] initial encounters with immigration authorities" indicated he was subject to mandatory detention under § 1225(b)(2), in part because

13

the government paroled him due to detention capacity, rather than to parole him in advance of filing an asylum application. *Caiza*, 2025 U.S. Dist. LEXIS 211907, at *15 ("[P]arole under § 1182 does not by itself demonstrate that he was initially detained under § 1225(b)(2)").

Therefore, any determination as to Mr. Yepez's detention must be conducted under the discretionary detention framework of Section 1226(a), which "governs the process of arresting and detaining noncitizens who have already entered the United States pending their removal," including expired parolees within the United States pending the adjudication of their asylum claim. *Tumba v. Francis*, No. 25-cv-8110 (LJL), 2025 U.S. Dist. LEXIS 219101, at *7 (S.D.N.Y. Nov. 4, 2025) (quoting Jennings, 583 U.S. at 288).

### 3.    Detention without a Warrant

Mr. Yepez's petition also challenges his detention on the grounds that Respondents' failure to conduct an initial custody determination and issue a warrant authorizing his arrest violates the INA. *Pet.* ¶¶ 39-42. He maintains that his ongoing detention is unlawful and, because Respondents never performed an initial custody determination or ever produced a warrant authorizing his ongoing detention, there is no custody determination for an Immigration Judge to review at a subsequent bond hearing and immediate release is therefore warranted. *Pet'r's Reply* at 4. Mr. Yepez argues that Respondents cannot remedy this violation by retroactively issuing a custody determination more than two weeks after his unlawful detention. *Id.* at 7-8.

Discretionary detention under § 1226(a) requires a warrant. *See Jennings*, 583 U.S. at 302; *see also Chogllo Chafla v. Scott*, 804 F. Supp. 3d 247, 256-61 (D. Me. 2025) ("[A]bsent a warrant a noncitizen may not be . . . detained under [§] 1226(a)"). Although the INA provides limited exceptions for warrantless interrogations and arrests, in order to continue to detain a noncitizen under § 1226, federal law, applicable agency regulation, and caselaw from this District Court require immigration authorities to conduct an initial custody determination and obtain a post-hoc warrant within forty-eight hours of initially detaining the noncitizen. *See, Makuiza v. Wesling*, No. 2:26-cv-00044-LEW, 2026 U.S. Dist. LEXIS 18216, at *3-12 (citing 8 U.S.C. §§ 1226(a), 1357(a); 8 C.F.R. §§ 236.1(c)(8), 287.3(d)). In other words, "when arrests are made without a warrant, a custody determination must ordinarily be made within 48 hours, accompanied by a notice to appear, and in the case of continued custody a warrant will be issued *post hoc*." *Id.* at *5-6, *7-13 (citing 8 C.F.R. § 287.3(d)) (ordering § 1226(a) immigration detainee released after authorities failed to conduct an initial custody determination and obtain a post-hoc warrant justifying continued detention within forty-eight hours of warrantless arrest).

The Court agrees with Mr. Yepez that because he is subject to discretionary detention under § 1226(a), Respondents are required by law to conduct an initial custody determination within forty-eight hours of his detention, accompanied by a post-hoc warrant. However, the Court does not agree that this conclusion requires his immediate release. Instead, the Court concludes that the 48-hour clock for Respondents to conduct an initial custody determination begins at the date and time

15

of this order.  Unlike in *Makuiza*, in which the Government initially detained the noncitizen pursuant to § 1226(a) but "neglected to" "justify[ ] its arrest decision[ ]," *id.* at *3-4, 11, in this case, Respondents do not concede Mr. Yepez is subject to § 1226(a) but rather maintain, consistent with controlling agency precedent, he is subject to mandatory detention under § 1225(b)(2), which does not require an initial custody determination or warrant.  *Resp'ts' Opp'n* at 1-2 (citing *Matter of Yajure Hurtado*, 29 I&N Dec. 216 (BIA Sep. 5, 2025)).  Moreover, to retroactively apply the Court's § 1226(a) determination in this matter would place Respondents in the untenable position in future cases presenting similar circumstances, in which Respondents must decide whether to deliberately violate controlling agency precedent in anticipation of a possible objection a detainee may or may not raise in a future habeas petition not yet before this Court, and then further guess how this Court might rule.

Rather, in this case, given that Respondents have maintained since his arrest, that Mr. Yepez is that subject to mandatory detention under § 1225(b)(2), the forty-eight-hour custody determination clock begins to run at the time of this Court's determination that Mr. Yepez is subject to § 1226(a).  Accordingly, the Court will order Respondents to conduct an initial custody determination of Mr. Yepez pursuant to § 1226(a), at which point they may either release him or continue to detain him.  If Respondents continue his detention, they must obtain an authorizing warrant and, as the Court concludes below, later provide Mr. Yepez a bond hearing before an Immigration Judge.

16

### 4. Bond Hearing

Because Mr. Yepez is currently in the United States, he is "entitled to the full procedural safeguards of the Due Process Clause of the Fifth Amendment," *Sampiao v. Hyde*, 799 F. Supp. 3d 14, 31 (D. Mass. 2025), which provides that he will not be "deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V; *see also Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (explaining "once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent"). As the petitioner, however, Mr. Yepez bears the burden of demonstrating by a preponderance of the evidence that his detention violates the Due Process Clause of the Fifth Amendment. *See De Oliveira v. Joyce*, 2:25-cv-00291-LEW, 2025 U.S. Dist. LEXIS 125776, at *8 (D. Me. July 2, 2025) (citing *Aditya W.H. v. Trump*, 782 F. Supp. 3d 691, 703 (D. Minn. 2025) (collecting authority)).

To determine whether detention violates procedural due process, courts apply the three-part test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See Hernandez-Lara*, 10 F.4th at 27-28; *see also Chogllo Chafla*, 804 F. Supp. 3d 247 at 261-264 (analyzing procedural due process challenge to the detention of noncitizen held pursuant § 1226(a) using the *Mathews* test); *Sampiao,* 799 F. Supp 3d at 30, 34 (same). Under *Mathews*, a court must weigh the following three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable

17

value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

### a.    Private Interest

In his petition, Mr. Yepez asserts "the most elemental of liberty interests—the interest in being free from physical detention by [the] government." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004); *see also Zadvydas*, 533 U.S. at 690 ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that the [Fifth Amendment's Due Process Clause] protects"). A noncitizen subject detained under § 1226(a) vindicates their due process rights through a bond hearing before an Immigration Judge who requires the government either to (1) prove by clear and convincing evidence that a noncitizen poses a danger to the community or (2) prove by the preponderance of the evidence that they pose a flight risk in order to detain them throughout the pendency of their removal proceedings. *See Hernandez-Lara*, 10 F.4th at 41. In this case, Respondents have refused Mr. Yepez the bond hearing he is guaranteed under § 1226(a) and have failed to meet their burden for his continued detention as due process requires. Mr. Yepez has therefore clearly established the first *Mathews* factor weighs in his favor.

### b.    Risk of Erroneous Deprivation

The second *Mathews* factor is "the risk of an erroneous deprivation of [Petitioner's] interest through the procedures used, and the probable value, if any, of

18

additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 335. The risk of erroneous deprivation is large where, as here, Respondents have made no showing that Mr. Yepez presents any public safety or flight risk. Accordingly, the second *Mathews* factor also weighs heavily in his favor.

### c. Government Interest

Finally, the third *Mathews* factor considers the "Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* Respondents do not raise any governmental interest favoring Mr. Yepez's continued detention without a bond hearing. *See Chogllo Chafla*, 804 F. Supp. 3d at 263 (identifying governmental interest in favor of immigration habeas petitioners' continued detention without a hearing as an "across-the-board application of an inapplicable statute"). In fact, the public interest weighs against detention without a hearing. *See Hernandez-Lara*, 10 F.4th at 33 (finding "unnecessary detention" of noncitizens "imposes substantial societal costs"). Thus, the third *Mathews* factor weighs against Respondents and in favor of Mr. Yepez.

The Court concludes that Respondents' detention of Mr. Yepez without a bond hearing pursuant to § 1226(a) therefore violates his due process rights.

## IV. CONCLUSION

The Court GRANTS in part and DENIES in part David Jose Perez Yepez's Verified Petition for Writ of Habeas Corpus Pursuant to § 2241 (ECF No. 11) and DIMISSES as moot Mr. Yepez's Unverified Petition for Writ of Habeas Corpus

Pursuant to § 2241 (ECF No. 1).  The Court ORDERS Respondents to conduct an initial custody determination of Mr. Yepez pursuant to 8 U.S.C. § 1226(a) and associated agency regulation within forty-eight hours of the time and date of this order.  If Respondents release Mr. Yepez, the Court ORDERS Respondents to return any of Mr. Yepez's personal property in their possession to him at the time of release. If Respondents continue Mr. Yepez's detention, the Court ORDERS Respondents to provide Mr. Yepez a bond hearing in accordance with 8 U.S.C. § 1226(a)(2) within fourteen days of the date of that custody determination.  The Court further ENJOINS Respondents from denying Mr. Yepez an initial custody determination or a bond hearing on the basis that 8 U.S.C. § 1225(b)(2) applies to him.

Lastly, the Court ORDERS Respondents to file a status report within twenty-four hours of conducting his initial custody determination, stating whether Respondents released or continued detaining Mr. Yepez, accompanied by the grounds supporting their determination and the warrant authorizing continued detention.  If Respondents continue detaining Mr. Yepez, the Court ORDERS Respondents to file a status report within five days of Mr. Yepez's bond hearing, stating whether Mr. Yepez has been granted bond, and, if his request was denied, the reasons for that denial.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 18th day of March, 2026

20